UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
THE PREMISES OF 15 COLLEGE ROAD,
APT 1, GOFFSTOWN, NEW HAMPSHIRE

No. 21-mj-_21-mj-250-AJ-01

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Dillon Torno, being duly sworn, depose and state as follows:

**Introduction and Agent Background**

1.      I submit this affidavit in support of an application for a search warrant for the following: (1) Apartment #1 of the multi-family residence ("the dwelling") and detached two car garage located at 15 College Road, Goffstown, New Hampshire 03102 ("the 15 College Road residence"), all described in more detail in Attachment A.[1] The items to be seized are more particularly described in Attachment B.

2.      Based on the facts and circumstances set forth in this affidavit, I submit that there is probable cause to believe that ZACHARY JANAS ("JANAS") is engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances), and that evidence of those offenses will be found in the places to be searched and on electronic devices described in Attachment B.

3.      I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I

---

[1] The U.S. Postal address for this address is 15 College Road, Manchester, New Hampshire; however, the property's tax address is 15 College Road, Gofftown, New Hampshire.

also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

4.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the FBI New Hampshire Safe Streets Gang Task Force ("NHSSGTF").  I have been a Special Agent with the FBI since December 2020.  My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.[2]  In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the controlled purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations and meetings, and Title III intercepts.

5.      Based on the facts and circumstances set forth in this affidavit, I submit that there is probable cause to believe that JANAS is engaged in narcotics trafficking activities that constitute violations of  21 U.S.C. § 841(a)(1) (distribution of controlled substances), and that evidence of those offenses will be found in the places to be searched.

---

[2] Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

**PROBABLE CAUSE**

6.        Since January of 2021, the FBI has been conducting a criminal investigation into a drug trafficking in New Hampshire, to include the city of Goffstown. To date, the investigation has involved the seizure of evidence, interviews with cooperating defendants, physical surveillance, controlled purchases of fentanyl and other narcotics, and phone analysis.  Based on the investigation, there is probable cause to believe that JANAS is using the premises described in Attachment A in furtherance of his drug trafficking activities and that the items associated with these crimes as further described in Attachment B will be located within the premises.

7.        On September 18, 2021, an FBI Task Force Officer ("TFO") and I debriefed a Cooperating Human Source ("CHS") regarding the CHS' prior contacts with JANAS. The CHS stated that over the past few months, the CHS purchased at least one-half kilogram or more of fentanyl from JANAS at the 15 College Road residence. The CHS informed the FBI that ▇ would either call or text message JANAS at (603) ▇ 1691 to arrange to meet him at the 15 College Road residence. The CHS would arrive alone at the 15 College Road residence in its vehicle and park in the driveway. The CHS would wait for JANAS, who each time emerged from the dwelling of the 15 College Road residence, walk past the CHS' vehicle and into the garage. JANAS would then either text message or motion to the CHS to come into the garage.

8.        Once in the garage, the CHS provided JANAS with the buy money and JANAS provided the CHS with fentanyl. It appeared to the CHS that JANAS at times had the drugs on his person before meeting with the CHS and at other times had the drugs stored in various locations in the garage.[3]  While in the garage on these occasions, the CHS would sometimes provide JANAS with personal use quantities of fentanyl or methamphetamine. The CHS stated

---

[3] The CHS informed me that at no time when at the 15 College Road residence to purchase drugs did the CHS see JANAS arrive to the residence in a vehicle prior to meeting with the CHS.

that JANAS always counted out the CHS' money after which the CHS returned to its vehicle and left the 15 College Road residence.

9.      The CHS informed me that several months ago, he/she was present inside Apartment 1 of the 15 College Road residence with JANAS and an unknown hispanic male ("Person #1") when JANAS arranged for the CHS to purchase fentanyl from Person #1. According to the CHS, when he/she arrived at the residence, the CHS exited its vehicle in the parking lot, walked onto the front porch and continued down the wrap around porch to the side door which the CHS stated opened directly into JANAS' residence.

10.     FBI agents involved in this investigation further determined through law enforcement data base checks that the telephone number (603) ███-1691 is associated with JANAS at the 15 College Road, Apartment 1, Goffstown, New Hampshire.  I also reviewed JANAS' State of New Hampshire drivers license which lists JANAS' residence as 15 College Road, Apartment 1, Goffstown, New Hampshire.

11.     On September 21, 2021, the CHS, acting under the direction of the FBI, arranged via text messages with (603) ███ 1691 to purchase one-half kilogram of heroin/fentanyl from JANAS at the 15 College Road residence.[4]

12.     In anticipation of this meeting, members of the FBI and New Hampshire State Police ("NHSP") established surveillance in the vicinity of 15 College Road. Prior to the meeting, members of the FBI NHSSGTF met with CHS.  During this time, FBI searched the

---

[4] The CHS is cooperating based on pending criminal charges based on his/her September 2021 motor vehicle stop and subsequent narcotics seizure by the New Hampshire State Police and FBI for possession with the intent to distribute narcotics. The CHS has provided information and/or active cooperation at the direction of the FBI in the hopes of receiving prosecutorial and/or judicial consideration at sentencing.  The CHS has a history of drug use although I believe that ███ is currently sober. CHS' previous criminal history includes misdemeanor drug charges. I believe that the information provided by the CHS is reliable as it is consistent with other government intelligence and has been independently corroborated through this investigation and other sources.

CHS and CHS's vehicle for unexplained currency, weapons and/or contraband with negative

results.  FBI provided CHS with audio transmitting and audio and video recording equipment, as

well as $7,500 Official Agency Funds (OAF) for the purchase of one-half kilogram of

heroin/fentanyl from JANAS.  Members of the FBI NHSSGTF then followed the CHS in the

CHS' vehicle to 15 College Road.

13.     FBI agents observed the CHS park in the driveway of 15 College Road. The CHS

exited the CHS' vehicle and entered the garage at 15 College Drive to speak with JANAS and

provide JANAS with the $7,000 OAF for the drug purchase. Afterwards, JANAS entered the 15

College Road residence and CHS entered the CHS' vehicle. After a brief time, JANAS exited the

residence and entered the CHS' vehicle. The CHS was in driver seat with JANAS in the

passenger seat, and the CHS' vehicle departed 15 College Road.

14.     FBI agents heard over audio transmitter JANAS directing the CHS where to go

and observed the CHS' vehicle drive from 15 College Road to English Village Road, Goffstown,

New Hampshire. Surveillance units observed a dark, tan skinned male wearing black plants and a

white T-shirt (Person #1) enter the back passenger seat of the CHS' vehicle. According to the

CHS,  Person #1 supplied JANAS with a black plastic bag that the CHS believed contained one

kilogram of fentanyl. Surveillance units observed Person #1 exit the CHS' vehicle and observed

the CHS' vehicle drive from English Village Road back to the 15 College Road residence with

JANAS in the passenger seat. Surveillance units observed the CHS and JANAS exit the vehicle

and enter the detached garage out of sight of surveillance units; however, agents heard in "real

time" via the audio transmitter worn by the CHS that JANAS divided the suspected

heroin/fentanyl and gave CHS half of the drugs. The CHS re-entered the CHS' vehicle, departed

15 College Road under FBI surveillance and drove directly to a predetermined meeting location, where CHS met with FBI agents.

15.     The CHS provided another FBI Task Force Officer ('TFO') and me with five clear plastic baggies containing a substance believed to be and purported to be fentanyl and returned $500 OAF to agents.  The CHS also returned the audio transmitting device and audio/video equipment. We searched the CHS and the CHS' vehicle for contraband, unexplained currency, or weapons with negative results.

16.     The CHS stated that when the CHS arrived at 15 College Road, JANAS arrived soon afterwards in a vehicle that he was driving. JANAS went into the garage and the CHS went into joined JANAS there.  JANAS told the CHS that they "might have to go for a ride." JANAS called a person who the CHS believed to be the narcotics supplier.  JANAS told the CHS that, "we'll have to go to him." The CHS gave $7,000 OAF to JANAS who went inside the 15 College Road residence, exited shortly thereafter, and entered the CHS' vehicle. JANAS directed the CHS to English Village Road, Goffstown, New Hampshire. JANAS called Person #1 who was walking along the sidewalk next to CHS' vehicle.  Person #1 told JANAS and the CHS to pull CHS' vehicle further forward. The CHS observed Person #1 reach into the bushes and grab a black bag then enter the rear passenger seat of the CHS' vehicle. Person #1 gave the black plastic bag to JANAS, who put it in a dark red duffel bag. JANAS then gave Person #1 cash. Person #1 told the CHS to pull the CHS' vehicle over because "this is where I live." Person #1 exited the CHS' vehicle, and JANAS directed the CHS to drive back to 15 College Road.

17.     Once back at the 15 College Road, the CHS and JANAS went into the garage where JANAS divided the suspected heroin/fentanyl from the bag provided to him by Person #1

and gave CHS five baggies of suspect heroin/fentanyl. CHS then got in CHS' vehicle and drove

back to the meeting location to meet with agents

18.     I reviewed of the audio/video equipment retrieved from the CHS and positively

identified JANAS based on a State of New Hampshire driver's license photograph of Zachery

JANAS with a year of birth 1983.

### Training and Experience Concerning Items to be Seized

19.     Based upon my training and experience, as well as the collective knowledge and

experience of other agents and police officers in my office, I am aware that drug traffickers very

often store controlled substances, firearms, and other tools of the drug trade in their homes,

automobiles, garages or outbuildings on their properties, basements, or other places under their

immediate control.  I am aware that it is generally a common practice for drug traffickers to store

their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic

baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other

locations they access with frequency.  Based on my training and experience, powder drugs such

as fentanyl are generally brought into the region in bulk.  However, such drugs are not typically

consumed by users in such high purity form.  Rather, such powder drugs, when ultimately

consumed by the user, are at a lower purity level.  High purity powder drugs are reduced in

purity by the addition of dilutants.  This process is called "cutting" or "stepping on" the drug.

Other equipment, such as scales, presses, grinders, razor blades, glass panes, blenders, and

mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a

usual practice is to repackage or "press" it in smaller quantities such as ten (10) gram fingers or

other types of plastic bags for redistribution.

20. It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

21. Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

22. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive,

and the phones they use in order to keep track of them.  They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

23.     It is also a generally common practice for traffickers to conceal at their residences, or other places they access frequently, large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators.  They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.  I know that drug traffickers sometimes purchase real estate with suspected drug proceeds.  They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

24.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such

identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

25.     Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

26.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.  I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

27.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

28.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

29.     I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize

motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

<u>Training and Experience on Digital Devices</u>

30.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

31.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones.  I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like WhatsApp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into

the United States) and with people who are most cautious about law enforcement detection.

Other applications like Venmo or Cash App allow people to quickly make financial transfers to

others and drug customers may use these methods to pay their sources of supply for drugs.

32.    In addition, those involved in drug trafficking crimes commonly communicate

using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones

is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular

numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such

numbers can confirm identities of particular speakers and the occurrence of certain events.

Based on my training, experience, and information provided by other law enforcement officers, I

know that many smartphones can now function essentially as small computers.  Smartphones

have capabilities that include serving as a wireless telephone, digital camera, portable media

player, GPS navigation device, sending and receiving text messages and e-mails, and storing a

vast range and amount of electronic data.  Examining data stored on devices of this type can

uncover, among other things, evidence that reveals or suggests who possessed or used the device.

33.    As with most electronic/digital technology items, communications made from an

electronic device, such as a computer or a cell phone, are often saved or stored on the device.

Based on my knowledge, training, and experience, as well as information related to me by agents

and others involved in the forensic examination of digital devices, I know that data in digital

form can be stored on a variety of digital devices and that during the search of a premises it is not

always possible to search digital devices for digital data for a number of reasons, including the

following:

   a.  Searching digital devices can be a highly technical process that requires specific

        expertise and specialized equipment.  There are so many types of digital devices

and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

13

d.  Electronic files or remnants of such files can be recovered months or even years
after they have been downloaded onto a hard drive, deleted, or viewed via the
Internet.  Electronic files saved to a hard drive can be stored for years with little
or no cost.  Even when such files have been deleted, they can be recovered
months or years later using readily-available forensics tools.  Normally, when a
person deletes a file on a computer, the data contained in the file does not actually
disappear; rather, that data remains on the hard drive until it is overwritten by new
data.  Therefore, deleted files, or remnants of deleted files, may reside in free
space or slack space, i.e., space on a hard drive that is not allocated to an active
file or that is unused after a file has been allocated to a set block of storage space,
for long periods of time before they are overwritten.  In addition, a computer's
operating system may also keep a record of deleted data in a swap or recovery
file.  Similarly, files that have been viewed on the Internet are often automatically
downloaded into a temporary directory or cache.  The browser typically maintains
a fixed amount of hard drive space devoted to these files, and the files are only
overwritten as they are replaced with more recently downloaded or viewed
content.  Thus, the ability to retrieve residue of an electronic file from a hard drive
depends less on when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.  Recovery of
residue of electronic files from a hard drive requires specialized tools and a
controlled laboratory environment.  Recovery also can require substantial time.

e.  Although some of the records called for by this warrant might be found in the
form of user-generated documents (such as word processing, picture, and movie

files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.

15

For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

34.     Based on my training and experience, I believe that it is likely that the 15 College Road Residence will contain smartphones that can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

35.     If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the

device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

36.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

37.     Although Apple's Touch ID may be the most common or well-known means for unlocking a device with a fingerprint, I am aware that other brands of smartphones like Samsung also offer a similar feature that works essentially the same way.  Therefore, when I refer to "Touch ID" I am not just referring to Apple devices, but to similar technology on all smartphones.  While I believe that the targets of this investigation likely use smartphones, I am not aware of the particular brand of phone that they use.

38.     The passcodes that would unlock the targets' devices is not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock devices with the use of the fingerprints

of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

39.     Based on the facts discussed in this affidavit I believe that JANAS is the primary user of cellular telephone number (603) ███ 1691, and thus his fingerprints and facial recognition are among those that are able to unlock the devices via Touch ID.  We intend to call this number when searching the premises where we believe JANAS resides. If the phones ring, and the user is present, I request authority to place his or her fingers on the Touch ID sensors or facial recognition to unlock the device.

## **CONCLUSION**

40.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of Title 21, United States Code, Sections 841(a)(1) will be found by searching the locations described in Attachments A.  Based upon my training and experience, I believe that the items set forth in Attachments B are commonly possessed by drug traffickers in their homes, automobiles, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by JANAS and others.

/s/ Dillon Torno
Dillon Torno
Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: __Sep 24, 2021__

Time: __5:11 PM, Sep 24, 2021__

Hon. Andrea K. Johnstone
United States Magistrate Judge

18

## <u>ATTACHMENT A</u>
### 15 College Road

15 College Road, Goffstown, New Hampshire, is described as a white, multi-story, multi-family residence, with a red door on the front of the residence marked with the number "15", and a red door on the left side of the residence that appears from the street view to be unmarked.  The 15 College Road residence also consists of a detached wooden two-car garage with a white door.  Between the residence and the garage is the driveway/parking area..

The premises to be searched includes Apartment 1 of the main dwelling and all attached and unattached rooms, attics, basements, garages and storage areas, floors, and outbuildings assigned to in whole or part of Apartment 1; surrounding grounds and common areas/staircases; as well as JANAS if he is present at the time of the execution of this search warrant.





**ATTACHMENT B**
**15 College Road**

1.      Controlled substances including, but not limited to heroin/fentanyl;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by ZACHARY JANAS or co-conspirators and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.      Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.      Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

10.     Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence,

delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning JANAS, business entities in which they are stakeholders, or co-conspirators; and

12.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.     For the cellular telephone assigned call number (603) ▮▮▮ 1691, which is used primarily by JANAS, I seek to search the telephones for:

     a.   Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

     b.   lists of customers and related identifying information;

     c.   types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

     d.   any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

     e.   any information involving the travel to obtain controlled substances or the transportation of controlled substances;

     f.   information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

     g.   all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

     h.   Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

      During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of JANAS, if found at the Subject Premises, to the fingerprint sensor, or use Facial Recognition, on the device or devices respectively believed to be used by each of them for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

4

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.